# EXHIBIT A

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CIVIL DIVISION

TERESSA LAFOLLETTE,

                Plaintiff,

       v.

JEFFERSON REGIONAL MEDICAL
CENTER d/b/a JEFFERSON HOSPITAL and
ALLEGHENY HEALTH NETWORK,

                Defendants.

CIVIL ACTION - LAW

Case No. GD-21-009680

**JURY TRIAL DEMANDED**

**COMPLAINT FOR VIOLATION OF THE
AGE DISCRIMINATION IN
EMPLOYMENT ACT, TITLE VII OF THE
CIVIL RIGHTS ACT OF 1964, AND THE
PENNSYLVANIA HUMAN RELATIONS
ACT**

Filed on behalf of:
Teressa LaFollette, Plaintiff

Counsel of Record for this Party:

John Stember, Esquire
PA ID No. 23643
jstember@stembercohn.com
**STEMBER COHN &
   DAVIDSON-WELLING, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
T.: (412) 338-1445
F.: (412) 338-1446

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| TERESSA LAFOLLETTE, | ) | CIVIL ACTION – LAW |
| | ) | |
| Plaintiff, | ) | Case No. GD-21-009680 |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| JEFFERSON REGIONAL MEDICAL | ) | |
| CENTER d/b/a JEFFERSON HOSPITAL and | ) | |
| ALLEGHENY HEALTH NETWORK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the court without notice for any money claimed in the complaint or for any claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE OR KNOW A LAWYER, THEN YOU SHOULD GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP:

Lawyer Referral Service
The Allegheny County Bar Association
11th Floor, Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
Telephone: (412) 261-5555

**IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| TERESSA LAFOLLETTE, | ) | CIVIL ACTION – LAW |
| | ) | |
| Plaintiff, | ) | Case No. GD-21-009680 |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| JEFFERSON REGIONAL MEDICAL | ) | |
| CENTER d/b/a JEFFERSON HOSPITAL and | ) | |
| ALLEGHENY HEALTH NETWORK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

AND NOW comes the Plaintiff, Teressa LaFollette ("LaFollette"), by and through her undersigned counsel, Stember Cohn & Davidson-Welling, LLC, who in support of her COMPLAINT respectfully avers as follows:

## PRELIMINARY STATEMENT

1.      LaFollette brings this civil action, charging that her joint employers, Allegheny Health Network ("AHN") and Jefferson Regional Medical Center d/b/a Jefferson Hospital ("Jefferson"), subjected her to discrimination and retaliation in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621, *et seq*, Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §2000e-1 *et. seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et. seq*.

2.      During her employment, LaFollette was harassed, subjected to a hostile environment, and ultimately discharged: (1) due to her age, (2) due to the sexual orientation and

(3) race of her family members, and (4) because she opposed conduct made unlawful by the ADEA, Title VII and the PHRA.

## PARTIES

3.      LaFollette is an adult individual who lives in Allegheny County, Pennsylvania.

4.      Defendant Allegheny Health Network ("AHN") is a Pennsylvania non-profit (non-stock) corporation with its primary place of business at 120 Fifth Avenue, Pittsburgh, PA 15222.

5.      AHN is an integrated health system with roughly 21,000 employees across its system of hospitals, surgery centers, health and wellness pavilions, and other locations of care. See **Exhibit A** (AHN Fast Facts), attached.

6.      Defendant Jefferson Regional Medical Center d/b/a Jefferson Hospital ("Jefferson") is a Pennsylvania non-profit (non-stock) corporation with its primary place of business at 565 Coal Valley Road, Jefferson Hills, PA 15025.

7.      Jefferson is an AHN hospital with over 1,500 employees.  See **Exhibit B** (Jefferson Fast Facts), attached.

## VENUE

8.      Pursuant to Pa.R.C.P. 1006 and 2179, venue is proper in Allegheny County, as the facts and causes of action asserted in the Complaint arose from events that occurred in Allegheny County, Pennsylvania and because Defendants maintain offices and facilities in Allegheny County.

## FACTS

9.      LaFollette was employed by Defendants AHN and Jefferson from February 6, 2017 until November 12, 2019, when she was terminated.

10.      AHN is a major healthcare provider that operates multiple hospitals and medical centers throughout western Pennsylvania, including Jefferson.

11.      In December 2013, LaFollette graduated from nursing school and became a registered nurse (" RN")

12.      On February 6, 2017, Defendants hired LaFollette as an RN at Jefferson.

13.      At that time, LaFollette was 45 years old.

14.      LaFollette is a white female.

15.      LaFollette has an adult son who is openly gay and bi-sexual.

16.      LaFollette has a sister who has bi-racial (white/African-American) children.

17.      LaFollette was assigned to work in the telemetry unit at Jefferson.

18.      During all times relevant to this action, Angie Ritz ("Ritz"), was manager/unit director of the telemetry unit and, in or around late 2018, Jill Price ("Price") became team leader and Ritz' assistant.

19.      Ritz and Price were LaFollette's immediate supervisors.

20.      The telemetry unit was divided in two sections, one on each side of the floor.

21.      Most of the nurses in the telemetry unit were in their 20's and considerably younger than LaFollette.

22.      LaFollette often worked in the telemetry unit with another RN, Darlene Flemming ("Flemming"), who was older than LaFollette.

23.     Typically, Ritz and Price assigned LaFollette and Flemming to one section of the telemetry unit and the younger nurses to the other section.

24.     Ritz and Price consistently assigned LaFollette and Flemming, the oldest nurses, more patients than the younger nurses.

25.     At times they assigned LaFollette as many as seven to 10 patients, which violated telemetry unit staffing policy; the younger nurses were never assigned that many patients.

26.     The telemetry unit had a maximum capacity of 28 patients.

27.     Typically, six nurses were scheduled on the telemetry unit each day with a nurse/patient ratio of 4/1.

28.     On April 7, 2018, Ritz assigned LaFollette and Flemming six patients, more than the younger nurses in the other section.

29.     During this shift, LaFollette was told to retrieve a patient who, during the previous shift, had been taken to get a CT scan.

30.     Under normal procedure, whenever a nurse from the unit took a patient for a CT scan, that nurse—the one who took the patient for the scan—was supposed to remain with him and return him to the unit.  In this instance, however, the nurse who took the patient simply left at the end of her shift without returning the patient to the unit.

31.     LaFollette explained to Mary Beth Balay, charge nurse (supervisor) on that shift, that she could not leave the telemetry unit as it would leave Flemming alone with 12 patients, which, again, was a violation of Jefferson policy and unsafe.

32.     Ritz later issued a written warning to LaFollette for not retrieving the patient.

33.     When LaFollette explained she was not in Jefferson when the patient had been taken for his CT scan, Ritz (groundlessly) accused her of lying, adding "it must be your old age creeping up you that you forget where you are."

34.     LaFollette decided to report Ritz' accusation and discriminatory conduct to Nursing Supervisor Jim Monack.

35.     As LaFollette walked to Monack's office, Ritz followed behind her, calling LaFollette an "old hag," "retard," "stupid," "pathetic," and "incompetent."

36.     After LaFollette complained to Monack, Ritz rescinded her written warning.

37.     Monack took no action against Ritz.

38.     On April 12, 2018, Ritz threatened LaFollette because she had complained to Monack, claiming that she could fire LaFollette for "whatever reason I want," and warning her to "forget about [what Ritz did]'" and to "be careful who you talk to."

39.     Thereafter, Ritz continued to assign more work to the older nurses in the unit, including LaFollette, and to make age-related remarks disparaging Lafollette.

40.     As time went on, Price, and younger Jefferson nurses, including Balay, Dawn Schaeffer and Ashley Reynolds, all in their 20s, as well as other Jefferson employees, Tracy (last name unknown, also a nurse), joined in disparaging LaFollette and making fun of her and questioning her competence based on her age.

41.     In January 2019, LaFollette's father died.

42.     Though uninvited, Price nonetheless came to LaFollette's father's funeral, at which time she met Plaintiff's openly gay son and saw LaFollette's sister's bi-racial children.

43.     After the funeral, Price told LaFollette, "I didn't know your son was gay."

44.     Thereafter, Price, Balay, and other younger nurses began to belittle LaFollette's gay son and multi-racial family, telling LaFollette, among other things, that she should be ashamed of having a mixed race family, that she must own a "black dildo," that she was a "nigger lover" and using other racial slurs.

45.     LaFollette reported the harassment to Ritz, who did nothing.

46.     In May or June of 2019, Ritz assigned LaFollette seven patients while she assigned only three or four patients to the younger nurses. LaFollette told Price about the disparity and potential danger to patients, and requested help.   Price refused to provide any.

47.     On June 13, 2019, Ritz issued a written warning to LaFollette for complaining about her patient-load and asking for help.

48.     In or around August 2019, when LaFollette complained about patient load, Reynolds replied, "Maybe you should retire. Maybe you're too old to handle this job."

49.     LaFollette reported Reynolds' ageist remarks to Ritz.

50.     Ritz took no action.

51.     On September 2, 2019, Balay was serving as charge nurse and had no patients assigned to her.

52.     Because LaFollette was caring for six patients on this shift, she asked Balay to take one of her patients, who was hypoxic, for a CT scan that was ordered some 12 hours earlier.

53.     Balay refused to take the patient because he had lice, telling LaFollette that she did not want to give her children lice but that LaFollette could because she was "older."

54.     LaFollette had to take the patient and leave Flemming alone with 12-15 patients.

55.     While LaFollette was off the unit, none of the younger nurses covered for her.

56.    LaFollette complained to Monack about Balay's neglect in refusing to take the patient for the scan (the patient died shortly thereafter) and about verbal abuse from Ritz and the younger nurses about her age, among other things.

57.    Monack promised to investigate, but never got back to LaFollette.

58.    Later, Price reprimanded LaFollette, stating that Balay reported that LaFollette had not provided care for the patient Balay refused to take for a CT scan.

59.    Ritz joined mid-discussion, telling LaFollette that she (Ritz) knew that "some of the girls lie" and that LaFollette should just do her job.

60.    Like Monack, Ritz took no action.

61.    During this time, LaFollette was working towards a BS in Nursing at California University of Pennsylvania ("CalU").

62.    LaFollette wrote a paper for one of her nursing classes in which she discussed the "lice incident," noting that no other nurse was disciplined for refusing to help this patient. LaFollette did not identify Jefferson or any nurse or patient involved. The paper was uploaded to an online portal restricted to class members.

63.    On September 12, 2019, unbeknownst to LaFollette, one of her CalU classmates who had previously worked at Jefferson, took a screenshot of the paper and sent it to Balay.

64.    Balay circulated it among the nurses in the telemetry unit.

65.    Coworkers harassed LaFollette about the paper, calling her an "old, stupid nurse."

66.    LaFollette complained to Price and Ritz, who again did nothing.

67.    LaFollette then discussed the incident with her CalU professor, Dr. Caruthers, who contacted Ritz to express concern that no other nurse had been disciplined and that LaFollette was facing retaliation.

68.    By October 2019, the harassment was so open and so offensive that a telemetry unit patient complained to Jefferson about the way staff spoke to and about LaFollette, including their discussion of "black dildos," something they often mentioned when discussing LaFollette.

69.    No disciplinary action was taken in response to this complaint or the nurses' racist comments.

70.    On October 31, 2019, Balay assigned LaFollette and Fleming seven patients each; the younger nurses were assigned a lesser number.

71.    One of these patients had bedbugs.

72.    Once again, Balay assigned the patient with bed bugs to LaFollette, telling LaFollette that it was because she was "old" and did not have young children.

73.    The patients LaFollette was assigned had serious and acute issues that required close attention; accordingly, she asked Shaffer, charge nurse that evening, if other nurses had been called in to assist.

74.    LaFollette also called Price for help; once again, Price refused to come in or provide help.

75.    Later that day, LaFollette overheard a call between Price and Shaffer in which Price, who was speaking loudly, said, "How f***ing dumb is Tressa?" and "Who does she think she is?"

76.    The next day, Ritz warned LaFollette not to complain about the lack of staffing again.

77.    When LaFollette reported on November 5, 2019, Price sent her and Tom Vislay (also an older nurse) home because the shift was overstaffed.

78.     Sending LaFollette and Vislay home violated Jefferson policy since both of them had signed up for overtime and were not supposed to be sent home in the event of overstaffing.

79.     Later in the shift, Ritz acknowledged that Price had made a "mistake" and told LaFollette to come back to work and "shut her mouth" when she returned.

80.     Ritz also complained about the "night shift" on which LaFollette worked, claiming that nurses on that shift were causing "problems," a reference to the results of an anonymous survey in which Jefferson nurses gave Ritz and other managers low scores.

81.     Before leaving, LaFollette met with Monack to discuss her complaints about harassment, scheduling and understaffing.

82.     Monack claimed that any scheduling or understaffing problems arose from decisions by the Unit Council, which is supposed to represent nursing units.

83.     When LaFollette asked if the Unit Council had actually met, Monack replied that she "probably missed" it because she is "slow and needs a cane to walk," adding that her situation would improve if she would "let other nurses say what they want" and "keep your mouth shut."

84.     LaFollette has never used a cane and is not disabled.

85.     On November 7, 2019, Ritz issued a Final Written Warning ("FWW") to LaFollette because she objected to being (improperly) sent home on November 5, 2019.

86.     In a meeting to discuss the FWW, LaFollette told Ritz that she had grown weary of the harassment and disparate treatment, and Ritz' refusal to address it.

87.     LaFollette asked Monack to transfer her out of Ritz' unit, which Monack promised to discuss but never did.

88.     On November 12, 2019, Jefferson terminated LaFollette for "unresolved issues."

89.    As LaFollette was escorted from Jefferson by four security guards, Ritz followed her, loudly calling LaFollette "pathetic."

90.    In fact, LaFollette was terminated due to her age, because she has a gay son and bi-racial family, and in retaliation for reporting discrimination.

91.    As a result of Defendants' conduct, LaFollette has suffered a substantial loss of earnings and other emoluments of employment, as well emotional distress and reputational damage.

92.    Defendants acted willfully and in reckless disregard of LaFollette's rights under the ADEA, Title VII and the PHRA by harassing her and ultimately discharging her on account of age, sexual orientation, race, and retaliation for opposing unlawful discrimination.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

93.    On or about April 16, 2020, LaFollette filed a Charge of Discrimination against Defendant AHN with the Equal Employment Opportunity Commission ("EEOC"), charging unlawful age-based discrimination and retaliation in connection with her job and discharge.

94.    In LaFollette's initial inquiry form submitted to the EEOC in connection with her Charge, and in her rebuttal to the employer's EEOC position statement, LaFollette also reported discrimination because some family members are gay or black, and those issues are within the scope of her Charge.  See attached **Exhibit C** (EEOC Inquiry Form at p.4) (yellow highlighting supp.) and **Exhibit D** (Response to Position Statement at p.2)(yellow highlighting supp.).

95.    The Charge was cross-filed with the Pennsylvania Human Relations Commission ("PHRC").

96.    During the EEOC proceedings, Defendant Jefferson responded to the Charge, asserting that it (Jefferson) was LaFollette's employer.

97.    By letter dated May 19, 2021, the EEOC notified LaFollette of her right to file a civil action.

98.    LaFollette filed an action within 90 days of receipt of the right-to-sue notice.

99.    LaFollette has exhausted her administrative remedies.

## CAUSES OF ACTION

### COUNT I
### Violations of the Age Discrimination in Employment Act of 1967
### (*Age Discrimination, Retaliation*)

100.    Paragraphs 1 through 99 are incorporated by reference.

101.    Defendants discriminated against LaFollette, on the basis of age by harassing her and creating and condoning a hostile, intimidating and offensive work environment that unreasonably interfered with her ability to perform her job, by subjecting LaFollette to disparate treatment based on her age, and by terminating her.

102.    Defendants retaliated against LaFollette because she reported and opposed age discrimination by harassing and discharging her.

103.    Defendants' acts of discrimination and retaliation violated the ADEA.

104.    Defendants acted willfully and in reckless disregard of LaFollette's statutorily-protected rights.

105.    LaFollette has suffered financial losses and severe emotional distress as a result of Defendants' unlawful age discrimination and retaliation.

106.    As a result of Defendants' wrongful acts, LaFollette is entitled to backpay, front

pay (or reinstatement), consequential damages, emotional distress damages, liquidated damages,

interest, attorneys' fees and costs pursuant to the ADEA.

## COUNT II
### Violations of Title VII of the Civil Rights Act of 1964
#### (*Race Discrimination, Sexual Orientation Discrimination, Retaliation*)

107.  Paragraphs 1 through 106 are incorporated by reference.

108.  Title VII prohibits discrimination on the basis of race and sexual orientation,

including, without limitation, discrimination because of the race or sexual orientation of a family

member.

109.  Defendants' acts and omissions described herein above violate Title VII.

110.  Defendants discriminated against LaFollette on the basis of age, sex, and race, by

harassing her, subjecting her to a hostile work environment, and terminating her employment.

111.  Defendants retaliated against LaFollette for opposing conduct made unlawful by

Title VII by harassing her, wrongfully disciplining her, and ultimately discharging her.

112.  Defendants acted willfully and in reckless disregard of LaFollette's civil rights.

113.  LaFollette has been harmed by Defendants' wrongful acts.

114.  As a result of Defendants' violations of Title VII, LaFollette is entitled to

backpay, front pay (or reinstatement), emotional distress damages, punitive damages,

consequential damages, interest, attorneys' fees, and costs of this action pursuant to Title VII.

## COUNT III
### Violations of Pennsylvania Human Relations Act
#### (*Age Discrimination, Sex Discrimination, Retaliation*)
#### § 951 *et seq.*

115. Paragraphs 1 through 114 are incorporated by reference.

116. Defendants' acts and omissions described herein above violate the PHRA.

117. Defendants discriminated against LaFollette on the basis of age, sex, and race, by harassing her, subjecting her to a hostile work environment, and terminating her employment, in violation of the PHRA.

118. Defendants retaliated against LaFollette for opposing unlawful age, sex, and race discrimination by harassing her, wrongfully disciplining her, and ultimately firing her, in violation of the PHRA.

119. The discrimination and retaliation have caused LaFollette to suffer extreme mental anguish, emotional distress, and loss of income, benefits and other emoluments of employment.

120. As a result of Defendants' wrongful acts, LaFollette is entitled to backpay, front pay (or reinstatement), emotional distress damages, consequential damages, interest, attorneys' fees, and costs pursuant to the PHRA.

## **PRAYER FOR RELIEF**

WHEREFORE, LaFollette respectfully requests that the Court award her damages in excess of $50,000, and specifically:

I.    Find that Defendants discriminated and retaliated against LaFollette in violation of the ADEA, enter judgment on her behalf, and award her:

a)    Back pay and benefits;

      b)      Front pay (or, in the alternative, reinstatement);

      c)      General, consequential and compensatory damages, including emotional distress damages;

      d)      ADEA liquidated damages;

      e)      Interest and costs of this action;

      f)      Attorneys' fees; and

      g)      Any other relief that the Court considers proper.

II.     Find that Defendants discriminated and retaliation against LaFollette in violation of Title VII, enter judgment on her behalf, and award her:

      a)      Back pay and benefits;

      b)      Front pay (or, in the alternative, reinstatement);

      c)      General, consequential and compensatory damages, including emotional distress damages;

      d)      punitive damages;

      e)      Interest and costs of this action;

      f)      Attorneys' fees; and

      g)      Any other relief that the Court considers proper.

III.    Find that Defendants discriminated and retaliated against LaFollette in violation of the PHRA, enter judgment on her behalf, and based on proof at trial, award her:

      a)      Back pay and benefits;

      b)      Front pay (or, in the alternative, reinstatement);

      c)      General, consequential and compensatory damages, including emotional distress damages;

a)    Interest and costs of this action;

b)    Attorneys' fees; and

c)    Any other relief that the Court considers proper.

Respectfully submitted,

Dated:  March 1, 2022                    /s/John Stember
                                         John Stember, Esquire
                                         PA ID No. 23643
                                         jstember@stembercohn.com
                                         **STEMBER COHN &**
                                              **DAVIDSON-WELLING, LLC**
                                         The Hartley Rose Building
                                         425 First Avenue, 7th Floor
                                         Pittsburgh, PA  15219
                                         T.: (412) 338-1445
                                         F.: (412) 338-1446

                                         *Attorneys for Plaintiff*

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CIVIL DIVISION

TERESSA LAFOLLETTE,                          )    Case No. GD-21-009680
                                             )
            Plaintiff,                     )    JURY TRIAL DEMANDED
                                             )
      v.                                     )
                                             )
JEFFERSON REGIONAL MEDICAL                   )
CENTER d/b/a JEFFERSON HOSPITAL and          )
ALLEGHENY HEALTH NETWORK,                    )
                                             )
            Defendants.                    )
                                             )

## **VERIFICATION**

I, Teressa LaFollette, attest that the facts in the foregoing COMPLAINT FOR VIOLATION

OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, TITLE VII OF THE CIVIL

RIGHTS ACT OF 1964, AND THE PENNSYLVANIA HUMAN RELATIONS ACT are true and

correct to the best of my knowledge, information, and belief, and made subject to the penalties of 18

PA. CONS. STAT. ANN. § 4904 relating to unsworn falsification to authorities.


_____1/19/22_____
Date

_____Teressa LaFollette_____
Teressa LaFollette
Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing COMPLAINT FOR VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AND THE PENNSYLVANIA HUMAN RELATIONS ACT was served upon Defendants, Allegheny Health Network and Jefferson Regional Medical Center d/b/a Jefferson Hospital by U.S. Mail on March 1, 2022 on the individual(s):

Mariah H. McGrogan, Esquire
J. T. Holt, Esquire
Reed Smith, LLP
225 Fifth Avenue
Pittsburgh, PA  15222-2716

The undersigned also hereby certifies that the foregoing COMPLAINT FOR VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AND THE PENNSYLVANIA HUMAN RELATIONS ACT was served upon by U.S. Mail on March 1, 2022 on the following entity:

Pennsylvania Human Relations Commission
301 Chestnut Street, Suite 300
Harrisburg, PA 17101-2702

Respectfully submitted,

/s/John Stember
John Stember, Esquire
PA ID No. 23643
jstember@stembercohn.com
**STEMBER COHN &**
**DAVIDSON-WELLING, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
T.: (412) 338-1445
F.: (412) 338-1446

*Attorneys for Plaintiff*

# EXHIBIT A

AHN

**(412) DOCTORS**

# Allegheny Health Network Fast Facts

Allegheny Health Network (AHN) is an integrated health system dedicated to providing exceptional care to people in our communities. Our patient-centered approach to care means a greater focus on coordinated health and wellness services, as well as being accountable and responsive to patients from start to finish.

## Highlights

- Formed in 2013

- Serves 29 Pennsylvania counties and portions of New York, Ohio, and West Virginia

- $3.6B in annual revenue

- 120,000+ annual discharges and observations

- 1.32M annual outpatient registrations

- 280,000 annual emergency visits

- 7,700+ annual births

## Integrated healthcare

- 13 hospitals with 2,200+ beds

- 6 surgery centers

- 5 Health + Wellness Pavilions

- 2,400+ employed/aligned physicians, residents, fellows and 6,000+ nurses

- 21,000 employees

- 250+ locations for care

- 11 residency programs

- 17 fellowship programs

## AHN diversified services

Home medical equipment, home health services, and home infusion therapy

- Group purchasing organization and distribution center

- Hospice

## Academic/Clinical affiliations and programs

- Drexel University College of Medicine

- Lake Erie College of Osteopathic Medicine

- Allegheny Health Network Research Institute

- Sidney Kimmel Comprehensive Cancer Center at Johns Hopkins

- Disruptive Health Technology Institute, with Carnegie Mellon University

- STAR Center – Simulations, Teaching, and Academic Research

- West Penn School of Nursing

- Citizens School of Nursing

## Our Specialties

At Allegheny Health Network (AHN), we provide comprehensive, patient-centered care for a broad spectrum of conditions and treatments.

See our most recent CareChex® Awards* for medical excellence, patient safety and quality care.

**SEE ALL SERVICES & SPECIALTIES**

## Our locations

When you or your family seeks medical care, you don't have to travel far. From hospitals, to outpatient centers, to diagnostic facilities, we are committed to caring for you within your community throughout Western Pennsylvania.

**SEE ALL LOCATIONS**

## Contact

Allegheny Health Network

**CONTACT AHN**

Careers

\* Source: 2021 CareChex® -- an information service of Quantros, Inc.

*The Northeast region includes Pennsylvania, New York, New Jersey, Rhode Island, Connecticut, Massachusetts, Vermont, New Hampshire, and Maine Southwestern PA region is the Pittsburgh-New Castle-Weirton, PA-OH-WV CSA (Combined Statistical Area)*

*Erie region is for Erie-Meadville CSA and contains hospitals from Erie, Meadville, Titusville and Corry.*





# (412) DOCTORS

(412) 362-8677

COVID-19 RESOURCES

Copyright © 2021 Allegheny Health Network. All rights reserved

# EXHIBIT

# B

## Comprehensive, high-quality care, close to home

Since 1977, Jefferson Hospital has brought expert medical and surgical care to residents of the Monongahela Valley and Pittsburgh's South Hills. In 2014, Jefferson Hospital added a new Women's Health Center, a new labor and delivery unit, the first obstetrics unit to be built in the region in 34 years, and a Level II Neonatal Intensive Care (NICU).

**AHN.org/Jefferson**

## Supporting community health

Your gift helps AHN support healthy communities with high-quality care that is both accessible and affordable.

**www.supportahn.org**

 CareChex

*Source: 2020 CareChex® – an information service of Quantros, Inc.

## Recognition

- First hospital in Allegheny County and one of just 63 in the entire United States to earn The Joint Commission's Gold Seal of Approval® for Perinatal Care Certification.

- Gold Plus Heart Failure Achievement Award and Gold Plus Stroke Quality Achievement Award recognition from American Heart Association/American Stroke Association Get With The Guidelines®.

- Jefferson Hospital is rated among the Top 100 Hospitals in the Nation for Medical Excellence in Bariatric Surgery and Major Cardiac Surgery*

- Jefferson Hospital is rated among the Top 10% of hospitals in the Nation for Patient Safety in Overall Medical Care and Chronic Obstructive Pulmonary Disease (COPD)*

- Blue Distinction Center+ designation for efficiency in delivering high-quality care and better overall outcomes for spine surgery care.

- International Board of Lactation Consultants (IBCLC) Care Award, for excellence in lactation care and a high level of support for breastfeeding families.

- Joint Commission Advanced Primary Stroke Center Certification, May 2018.

- Joint Commission Hip/Knee replacement Recertification, February 2018.

- Keystone 10 designation for Quality Improvement in Breastfeeding.



PHYSICIANS: **525**    FULL-SERVICE HOSPITAL BEDS: **341**    EMPLOYEES: **1,774**

FAST**FACTS**
2020

AHN JEFFERSON
Hospital

565 Coal Valley Road, Jefferson Hills, PA 15025  |  (412) 469-5000

Allegheny Health Network (AHN) complies with applicable federal civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability or sex in its health programs and services. In order to treat individuals in a nondiscriminatory manner, AHN provides free communication aids and language assistance services.
ATTENTION: If you speak English, language assistance services, free of charge, are available to you. (412) 469-5000
ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al (412) 469-5000
注意：如果您使用繁体中文，您可以免費獲得語言援助服務。請致電 (412) 469-5000
04/20  HC410572



We combine compassion and support with innovative technology to aim for the best possible outcomes.

AHN doctors and clinical specialists work in multidisciplinary teams to provide personalized, comprehensive care for each patient — and access to clinical trials for the newest therapies.

### CANCER INSTITUTE

We treat all types of cancer through surgery, radiation, chemotherapy, biologic therapy, immunotherapy, genomics, pathology testing, and imaging studies.

- Nurse navigators help cancer patients coordinate tests and treatment.
- Collaboration with Johns Hopkins Kimmel Cancer Center to advance care and give streamlined and guided access to clinical trials and second opinions.

### CARDIOVASCULAR INSTITUTE

We keep hearts beating with new medicines, advanced hybrid procedures, and implantable devices to fight heart disease. Patients receive personalized treatment for heart failure, arrhythmia, pulmonary hypertension, and thoracic and lung disease.

- Robotic and minimally invasive surgery can reduce risk and speed recovery.
- Patients benefit from cardiac education, screenings, prevention, and rehabilitation.

### EMERGENCY MEDICINE INSTITUTE

We offer critical 24/7 access to highly skilled emergency care, coordinating with EMS and emergency transport through our Prehospital Care Service team.

- Our newly expanded Emergency Department welcomes patients to a spacious, modern facility with the latest medical advances in emergency care.
- In-department imaging for X-ray and CT scans.
- LifeFlight helicopters for life-saving care and fast patient transport.
- Primary stroke center certified at the highest level.
- Our Front Door program helps patients who lack basic social needs that can affect their health — like food and transportation, — get help in the community.

### NEUROSCIENCE INSTITUTE

We are leaders in providing, innovative, expert medical and surgical treatment for patients with complex brain, spine, and neurological conditions.

- Advanced, personalized care for movement disorders, stroke, or tumors.
- Managing headaches, back, and neck pain with therapy, medications, or surgery.
- AHN's Cabouet Center for Comprehensive Parkinson's Care, where specialists use new medications and innovative surgeries, including life-changing deep brain stimulation implants.

### ORTHOPAEDIC INSTITUTE

High-quality specialized care for orthopaedic injuries and complex musculoskeletal conditions so patients can increase mobility, regain health, and get back to the lives they love.

- New therapies for comprehensive, coordinated, concussion care.
- Sports medicine specialists help athletes regain strength and flexibility to achieve their best performance.
- First health system in Pennsylvania to use ExactechGPS® for shoulder replacement surgery.

### WOMEN AND CHILDREN INSTITUTE

We care for women throughout their lives with well-woman services, obstetrics, primary care, breast care, advanced gynecologic surgery, bone density testing, and all medical sub-specialties.

- Family-centered childbirth in our spacious, birthing suites and a Level II NICU.
- Midwives are available for those who prefer a more natural approach to childbirth.
- Innovative treatments are offered for gynecological cancers, infertility, pelvic health, and behavioral health.

### SPECIALTIES

Allergy and immunology
Bariatrics
Behavioral Health
Cardiac, thoracic, and vascular surgery
Child and Adolescent Psychiatry
Chronic care
Colorectal surgery
Critical care medicine
Emergency medicine
Endocrinology
Gastroenterology
Geriatrics
Gynecology
Hospitalist care
Inclusion health
Infectious disease
Integrative medicine
Internal medicine
Lupus and autoimmune disease
Maternal fetal medicine
Nephrology
Neurology
Oncology
Ophthalmology
Oral and maxillofacial surgery
Otorhinolaryngology
Palliative care
Pathology and laboratory medicine
Pediatrics
Physical medicine and rehabilitation
Plastic and reconstructive surgery
Psychiatry and psychology
Pulmonary and respiratory disease
Radiology
Rheumatology
Reproductive medicine and fertility
Sleep medicine
Transplant surgery
Urogynecology
Wound care

# EXHIBIT C

# EEOC (INQUIRY) NUMBER: 533-2020-00253

## Inquiry Information

### REASON(S) FOR CLAIM

**Date of Incident (Approximate):** 11/07/2019

**Reason for Complaint:** Age - I am 40 years of age or older, Retaliation - I filed a charge of job discrimination about any of the above

**Pay Disparity:**

**Location of Incident:** Pennsylvania

**Submission (initial inquiry) Date:** 11/08/2019

**Claim previously filed as charge with EEOC?** No

**Approximate Date of Filing:** N/A

**Charge Number:** N/A

**Claim previously filed as complaint with another Agency?** No

**Agency Name:** N/A

**Approximate Date of Filing:** N/A

**Nature of Complaint:** N/A

### INQUIRY OFFICE

**Receiving:** Pittsburgh Area Office

**Accountable:** Pittsburgh Area Office

### APPOINTMENT

**Appointment Date and time:** 11/21/2019 02:00 PM US/Eastern

**Interview Type:** Phone

### APPROXIMATE DEADLINE FOR FILING A CHARGE:  09/02/2020

### POTENTIAL CHARGING PARTY

**First Name, Middle Initial:** Teressa, L

**Last Name:** Lafollette

**Street or Mailing Address:** ███████████████

**Address Line 2:**

**City, State, Zip:** ████████████

**Country:** UNITED STATES OF AMERICA

**Year of Birth:** ████

**Email Address:** ████████████

**Home Phone Number:**

**Cell Phone Number:** ████████████

## RESPONDENT/Employer

**Organization Name:** ALLEGHENY HEALTH NETWORK

**Type of Employer:** Business or non-profit organization that I applied to, work for, or worked for

**Number of Employees:** Less than 15 employees

**Street or Mailing Address:** 565 Coal Valley Road

**Address Line 2:**

**City, State, Zip Code:** JEFFERSON HILLS,PA, 15025

**County:**

**Phone Number:** (412) 469-5000

## RESPONDENT CONTACT

**First and Last Name:** Jim Monack

**Email Address:** ████████████

**Phone Number:**

**Title:** Human Resources Director or Owner

## LOCATION OF POTENTIAL CHARGING PARTY'S EMPLOYMENT

**Street or Mailing Address:**

**Address Line 2:**

**City, State, Zip Code:**

**County:**

## POTENTIAL CHARGING PARTY'S DEMOGRAPHICS

**Gender:** F

**Disabled:** I do not have a disability

**Are you Hispanic or Latino?** not hispanic or latino

**Ethnicity:** White,

**National Origin:** American(U.S.)

## Adverse Action(s)

Nov 7, 12 2019, age discrimination

# Supplemental Information

### What Reason(s) were you given for the action taken against you?

None

### Was anyone in a similar situation treated the same, better, or worse than you?

Yes  Darlene Fleming, RN and Tom Vislay, RN both over the age of 40

### Please provide name(s) and email and/or phone number of anyone who will support your claim, and briefly describe the information this person will provide.

Darlene Fleming 

### Please tell us any other information about your experience?

I feel that I have been discriminated against due to age.  This has been ongoing as i have documentation back as long as 2018 but the last event was when I was at my job as a nurse.  On Thursday night, Nov 7, 2019, I was at work from 7p-7a.  I was floating until 11p because the supervisor had me assigned same assignment as another nurse.  At 10p, Charge Nurse stated to everyone that I would be at  post with another >40 year old nurse because no other nurse would be able to cover.  This type of situation, supervisors would call staff members to help with coverage especially in a high acuity.  When supervisor was texted at home to see if all staff members were contacted to fill coverage, her response was yes she called everyone.  Charge Nurse called a couple night shifters and they all said they have not been called. They would have helped if they would have known earlier in the day.  I stated this to Supervisor, Jill Price and she said well what do you want me to do "I called everyone" she said.  I cant be there 24/7 and I am not coming in to help. I stated to her that me and Darlene, other nurse with me who is also >40 cannot be

responsible for this acuity and our licenses are in jeopardy because of large fall risk to our patients.  She said, in a text to me, "how much more can i do besides come in and work all day and night?" I texted her that I never asked her to come in. At this point, she said she cant do everything.  Everyone is not telling the truth.  At that point, she called the Charge Nurse, Dawn, RN and said how stupid is she (Teressa)? "She is useless and stupid" she told Dawn and I heard that conversation as I heard her yelling at her as I sat right next to her while Dawn, RN tried to talk to her. But she continued to swear and call me names and say, "me and Darlene will just have to do it."  The other side of the unit had all younger nurses on it including Dawn, RN. I feel my age and my concerns and being called names was an age discrimination due to the circumstances.  Darlene, RN is also an older nurse and this is just one instance where I was made fun of because of my age, my family being black, and my family members being gay.  Other circumstances I have documented in my own notes with dates and situations where I always felt threatened at my job, harassed, retaliated against, and age discrimination with no help from upper management to help make a better and safe environment.  On Nov 12, 2019, I was called off for no reason to enforce I come back in and then to pull me from unit.  I did as they requested.  Before going back in, I had a conversation with Jill Price and I said there has to be some communication breakdown because this situation should not have happened.  They called me and another nurse off who is also >40.  She started yelling at me and asking me if I am calling her incompetent.  I told her that is not what i said.  She then said "I dont want to hear it come do your job and shut the F up." When I came in to do my job, the nurse >40 came to me and said i wish i would have known you were here i would have came in too.  I told him he had to talk to management about that.  I was pulled in my Managers, Angie Ritz&apos; office Nov 7 at 11a to tell me I am going home for the rest of the day because I told my supervisor she is incompetent.  I explained to her that is not what happened.  Angie said, "she dont care she is sick of my shit and get my stuff and get out."  I was stirring the pot by saying what I did to the other >40 y.o. nurse. I asked to speak to her boss, Jim Monack and he said he is siding with his managers and I am to go home today. He dont care.  I had called him in afternoon as my patients were left with no nurse and i did not chart.  He said "who cares."  I asked him to please transfer me off this unit and he said yes I can and can talk to him on Wednesday in a Unit Council meeting that has been previously scheduled.  I asked if he had a chance to talk to Angie as to why I had to leave today and he said yes he talked to her but he dont know why I was told to leave and did not understand why either but is supporting his managers regardless of my concerns. I asked him so I should come back to work?  He said yes on next scheduled day.

EXHIBIT
D

S|C|D-W    **Stember Cohn** +
           **Davidson**-**Welling** LLC

The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219

jstember@stembercohn.com
Writer's Extension: 18

July 16, 2020

**VIA EMAIL AND U.S. MAIL**
jane.robertson@eeoc.gov

Jane Robertson, Investigator
EEOC – Pittsburgh Area Office
1000 Liberty Avenue
Room 1112
Pittsburgh, PA 15222

       Re:    Teressa L. LaFollette v. Allegheny Health Network
             EEOC Charge No. 533-2020-00253

Dear Ms. Robertson:

On behalf of Complainant, Teressa LaFollette ("LaFollette"), we submit this Response to Jefferson Regional Medical Center's ("Jefferson") June 10, 2020 Position Statement ("PS") in the above Charge.

In its PS, Respondent contends that "if Ms. Ritz had an 'age bias,' she would not have hired Ms. LaFollette in the first place." However, the question is not whether Ritz was "age biased" at hire, but whether LaFollette was harassed and terminated due to her age and in retaliation for complaining about it.  Further, if Jefferson's contention is an accurate statement of the law — which it is not — no complainant could ever pursue a discriminatory discharge.

Further, Jefferson's argument is based on the wrong facts. LaFollette was not hired by Ritz. She interviewed with and was hired by Arlene Yost ("Yost"), Nurse Manager at the time. Yost retired after LaFollette's hire, and only thereafter did Ritz assume that position.

In its PS, Jefferson claims that LaFollette makes only vague allegations of harassment and discrimination. Once again, this is simply not true. LaFollette alleged that when she started in February 2017 until termination in November 2019, she was subject to countless instances of harassment. Below we detail a number of instances. While these are far from exhaustive, they paint a vivid picture of the culture of LaFollette's nursing unit at Jefferson.

Jane Robertson, Investigator
July 16, 2020
Page: 2

**I.**    **LaFollette Was Harassed Frequently**

      Many younger nurses who worked with LaFollette harassed her because of age.  The ring leaders were Mary Beth Balay ("Balay"); Jill Price ("Price"), her direct supervisor; and Angela Ritz ("Ritz"), Nurse Manager. Balay and Price frequently remarked that Complainant was a stupid and incompetent "old" nurse. They often disparaged her about her son, Alec (21), who is bi-sexual, and because her family is multi-racial. Other co-workers did so as well, telling LaFollette almost daily how awful it must be for her to be old with a gay son, and that she should be ashamed her family is mixed race. On several occasions they wondered aloud if LaFollette owned a "black dildo".

      Nurses made these age- and race-biased comments so frequently that, in October 2019, a patient complained. When the complaint reached Ritz, she did nothing to stop them. Instead, Ritz told LaFollette to "suck it up" and "stop being a cry baby." On several occasions, Ritz remarked that LaFollette needed to use a cane to walk, though she does not.

      The harassment grew worse after an incident on September 2, 2019.  When LaFollette arrived at work that day, a nurse told her about a patient who needed to be taken for a CT scan. No other nurse would take this patient because she had lice. Needing to attend to her own patients, LaFollette asked Balay, who was "floating" that day, to take the patient for the scan. Balay refused, stating that she did not want to take lice home to her kids. Balay told LaFollette she should do so because she is older and did not have young children.

      When no other nurse would step forward, LaFollette took the patient for the CT scan. After she did so, Price reprimanded her for neglecting her other patients. Though Balay refused to take the patient (due to lice), Balay was not reprimanded.

      During this time, LaFollette was also working toward a Nursing Degree at California University of PA ("CalU").  She wrote a paper about the lice incident, noting that no other nurse was disciplined for it. Her paper made no mention of Jefferson, or name any nurse or patient. She uploaded it to an online portal restricted to class members.

      A classmate, however, formerly worked at Jefferson.  She took a screenshot of the paper and sent it to Balay on September 12, 2019.  Balay circulated it among other nurses. These nurses, in turn, harassed LaFollette about the paper, calling her an "old, stupid nurse." When LaFollette complained to Price and Ritz, they did nothing. LaFollette then reported the harassment to Dr. Caruthers, Chair of Nursing at CalU, who called Ritz to express concern that the offending nurses were not reprimanded. Dr. Caruthers also cautioned LaFollette that she might face retaliation for writing the paper.

Jane Robertson, Investigator
July 16, 2020
Page: 3

Later, Balay told LaFollette that she should have been "written up" for violating HIPPA, though there was no identifying information in the paper, and it was the younger nurses who circulated it.

## II.    LaFollette Was Treated Differently Than Younger Nurses

LaFollette was regularly subjected to less favorable treatment than younger nurses. Only she seemed to be assigned patients with lice or bed bugs, though assignments are to be rotated equally. In addition to the September 2 lice-related incident, on October 31, LaFollette was assigned to care for a patient with bed bugs. According to Balay, LaFollette was "old" and did not have kids, so it would be fine if she brought bed bugs home.

Assigning more patients to older nurses in LaFollette's unit was common. On October 31, 2019, Lafollette and Darlene, also an older nurse, were told to manage seven patients each while the three younger nurses only managed four or five. Most of LaFollette's patients had serious and acute issues requiring close attention. The assignments were not only unequal but dangerous. Leaving a single nurse to manage seven patients with acute issues increases risk.

LaFollette asked if Price had called in any other nurses due to understaffing. Price replied that, "I can't be there 24 hours a day." Later, Price called the charge nurse to complain. LaFollette was next to the charge nurse and could hear Price screaming, "How f***ing dumb is Teressa?" and "Who does she think she is?" Price accused LaFollette of calling her incompetent and asking her to do more than she possibly could.

LaFollette later called Ritz to alert her to the situation Price had left her in. She worried that, if something had happened to a patient, she could endangered her license. Price's response? She told LaFollette to shut up, do as she was told, and not to raise the issue again.

Shortly thereafter, on November 5, 2019, Price told LaFollette and Tom Vislay, an older nurse, to go home because they were "called off."  Because she should not have been sent home under Jefferson policy, LaFollette called Price. Price said that she did not know that was policy and accused LaFollette of calling her "incompetent," which LaFollette never did. Soon after, Ritz told LaFollette that the charge nurse had made a "mistake" and LaFollette should return to work, shut her mouth, and do her job. Ritz added that if LaFollette had a problem she should talk with Jim Monack ("Monack"), Director of Nursing.

Ritz also told LaFollette that the night shift, LaFollette's shift, was causing "problems." This was a reference to an anonymous survey in which the nurses were asked to evaluate management. When night shift nurses gave management low scores, management retaliated against LaFollette and other older nurses, frequently switching them between shifts. When LaFollette raised this with Monack on November 7, 2019, he said the decision was voted on by

Jane Robertson, Investigator
July 16, 2020
Page: 4

Unit Council, which represents nursing units. LaFollette questioned whether there was such a meeting. Echoing Ritz, Monack said that LaFollette probably missed it because she is slow and needs a cane to walk. They also discussed LaFollette's problems with Ritz and other nurses. Echoing Ritz, Monack told her to suck it up, and that the situation would improve if she would just let other nurses say what they want and she (LaFollotte) kept her mouth shut.

The above events are the most recent examples of harassment and retaliation, but they are not the first. On April 7, 2018, LaFollette and Darlene were assigned six patients each. LaFollette was told that she needed to retrieve one of her patients from the CT scan unit. She objected, not wanting to leave Darlene alone with all 12 patients, which could be dangerous.

She asked which nurse took the patient to the CT unit, but it turned out that no nurse had accompanied the patient. However, since the patient had bilateral chest tubes it was against policy to transport him without accompaniment. Note that the nurse on duty when the patient was taken for the CT scan was not reprimanded, yet Ritz wrote up LaFollette for failing to accompany the patient.

LaFollette explained to Ritz that she was not in the Hospital when the patient was taken for the CT scan. Ritz accused her of lying and said, "It must be your old age creeping up on you that you forget where you are." LaFollette decided to tell Monack about this. On the way to his office, Ritz followed LaFollette, calling her a "retard," "old hag," "stupid," "pathetic," and "incompetent." After LaFollette spoke with Monack, Ritz rescinded the written warning.

Shortly thereafter, on April 12, Ritz threatened LaFollette if she complained about harassment. She instructed LaFollette to forget the incident. LaFollette told her that she was documenting harassment and intended to discuss it with Monack. Again, Ritz threatened LaFollette, warning to be "careful" about who she talks to and reminding her that Ritz could fire her for whatever reason she wants.

III.    **LaFollette's Disciplinary Actions**

Jefferson notes two instances of discipline against LaFollette, which it offers as the basis for termination. The Hospital's version of events excludes or ignores crucial details, as we explain.

In the first, Jefferson references alleged "inappropriate professional behaviors" without explaining what the behavior supposedly was. LaFollette is aware of one instance. On the day in question, she was assigned seven patients, whom she attended to for hours without a lunch break. At the same time, younger nurses were assigned only three or four patients each and were able to take lunch breaks. LaFollette told the charge nurse about the disparity in assigned patients and asked for some help. For asking this question — which in itself is "protected activity" — LaFollette received a written warning for insubordination.

Jane Robertson, Investigator
July 16, 2020
Page: 5

The second disciplinary action arose on November 5, when LaFollette asked why she was sent home in contravention of policy. Ritz berated her and accused her of allegedly calling Price incompetent and said she would write LaFollette up. Though LaFollette had done nothing of the sort, Ritz sent her home.

As typical, Respondent failed to consider LaFollette's comment — "I want off this unit and I'm sick of you" — in context.  LaFollette was "sick" of the harassment, Ritz's refusal to address it, and the disparate treatment to which she was subjected. She did not want to leave Jefferson; she wanted a transfer to a different unit. Later, she asked Monack for a transfer, which he promised to discuss the following week, but never did.

Rather than explore a transfer, Jefferson fired LaFollette for "unresolved issues."  In one final act of humiliation, Ritz summoned four security guards to escort LaFollette from the Hospital, yelling that she was "pathetic" as she exited.

IV.    **Conclusion**

In sum, LaFollette was demeaned, harassed, bullied, berated, and subject to disparate treatment due to her age and retaliation when she complained about it. She made multiple, attempts to redress this treatment without success or any meaningful attempt by Jefferson to address it.  When LaFollette decided that she had enough and asked for a transfer to a different unit — and a request for a transfer is "protected activity" — Jefferson fired her.

*    *    *

Should you have any questions regarding the above or need additional information, please do not hesitate to contact us.

Sincerely,

John Stember

JS/tms

cc:    Teressa LaFollette (*via email*)